**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

JEFFREY WAYNE TRUMP,

      Plaintiff,

v.                                       CIVIL ACTION NO. 5:20-cv-00445

ANDREW SAUL,
Commissioner of Social Security,

      Defendant.

**PROPOSED FINDINGS & RECOMMENDATION**

Plaintiff Jeffrey Wayne Trump ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33. (ECF No. 2.) By standing order entered on January 4, 2016, and filed in this case on June 30, 2020, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3.) Presently pending before this Court are Claimant's Brief in Support of Judgment on the Pleadings (ECF No. 16) and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 17).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 16), **GRANT** the

Commissioner's request to affirm his decision (ECF No. 17), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.    BACKGROUND

### A. Information about Claimant and Procedural History of Claim

Claimant was 44 years old at the time of his alleged disability onset date and 46 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (*See* Tr. at 212.)[1]  He is a high school graduate.  (*Id*. at 231.)  Most recently, he worked as an electrician in a coal mine, and he has also been employed as a police officer and a delivery driver.  (*Id*. at 232.)  Claimant alleges that he became disabled on March 18, 2017, due to "CIDP," "Bulging Disc in lower back," anxiety, depression, bipolar disorder, insomnia, high blood pressure, "Spinal cord disease," and "Fatigue and Weakness."  (*Id*. at 226, 230.)

Claimant protectively filed his application for benefits on April 25, 2017.  (*Id*. at 209–13.)   His claim was initially denied on August 8, 2017, and again upon reconsideration on November 9, 2017. (*Id*. at 128–38, 140–46.) Thereafter, on December 12, 2017, Claimant filed a written request for hearing.  (*Id*. at 147–48.)  An administrative hearing was held before an ALJ on June 11, 2019, in Mount Hope, West Virginia, with the ALJ appearing from Tampa, Florida.  (*Id*. at 40–65.)  On July 3, 2019, the ALJ rendered an unfavorable decision.  (*Id*. at 18–39.)  Claimant then sought review of the ALJ's decision by the Appeals Council on July 18, 2019.  (*Id*. at 203–08.)  The Appeals Council denied Claimant's request for review on May 4, 2020, and the ALJ's decision became the final decision of the Commissioner on that date.  (*Id*. at 1–7.)

---

[1] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 13.

Claimant timely brought the present action on June 29, 2020, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).  (ECF No. 2.)  The Commissioner filed an Answer (ECF No. 12) and a transcript of the administrative proceedings (ECF No. 13).  Claimant subsequently filed his Brief in Support of Judgment on the Pleadings (ECF No. 16), and in response, the Commissioner filed his Brief in Support of Defendant's Decision (ECF No. 17).  As such, this matter is fully briefed and ready for resolution.

### B.  Relevant Medical Evidence

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it here for the convenience of the United States District Judge.

#### 1.  Spine and Lower Extremity Treatment During Relevant Period

On May 1, 2017, Claimant presented to his neurologist and complained of "back pain which is worse when he sits" but was relieved "[w]hen he lays down."  (Tr. at 414.) Upon physical examination, the neurologist observed "very mild postural tremors."  (*Id.* at 415.)  She prescribed an additional medication to treat his back pain.  (*Id.* at 415–16.) When he returned to his neurologist several months later on August 16, 2017, Claimant reported that he had recently undergone intravenous immunoglobulin therapy the previous month and was scheduled for another session in the coming weeks.  (*Id.* at 534.) He complained of painful joints and back pain.  (*Id.* at 535.)  Upon physical examination, the neurologist again observed "very mild postural tremors."  (*Id.*)  Claimant was instructed to continue his current medications, and his neurologist prescribed an "[a]nkle foot orthosis" brace and physical therapy to treat his right foot drop.  (*Id.* at 535.) Claimant was fitted for the brace on August 21, 2017, and it was delivered on August 31,

2017.  (*Id.* at 545–46.)  He also received an aluminum cane on August 21, 2017.  (*Id.* at 538.)

Claimant began physical therapy to treat his "right foot drop, [lower extremity] weakness, and impaired gait/balance with frequent falls due to [right lower extremity] instability" on August 29, 2017.  (*Id.* at 547.)  He told the physical therapist that he "Has used straight cane for the past week" and fell four times during the preceding year.  (*Id.*)  He also reported knee and ankle instability.  (*Id.* at 547–48.)  Upon physical examination, the physical therapist observed decreased muscle strength in Claimant's right ankle, "Right Lower leg muscle atrophy," and "Limited right ankle dorsiflexion."  (*Id.* at 548.)  The physical therapist recommended that Claimant attend two or three sessions per week for three weeks, with a goal to "address the identified impairments within a 6 week time frame."  (*Id.*)  At his next session on September 5, 2017, the physical therapist remarked, "His gait is improved, but he displays some foot eversion today" and "is not using a cane during gait today."  (*Id.* at 554.)  On September 7, 2017, Claimant told the physical therapist that "he is getting used to the new [brace] and it seems to be working well."  (*Id.*)  The physical therapist noted that he was "Compliant with home program."  (*Id.* at 552.)  Claimant also "Reports progress toward goals / benefit from treatment" at his September 12, 2017 session.  (*Id.* at 550.)

Claimant next presented to his neurologist on November 13, 2017, and he reported "no new problems."  (*Id.* at 640.)  Upon physical examination, she observed decreased motor strength in his right lower extremity and "very mild postural" tremors.  (*Id.* at 641.)  He underwent intravenous immunoglobulin therapy on December 7, 2017, and again on March 1, 2018.  (*Id.* at 637–38, 646–47.)

On March 9, 2018, Claimant presented to his primary care physician and complained of back pain that had increased because he was driving his wife a significant distance to her cancer treatments "all the time." (*Id.* at 611.) However, on March 26, 2018, he told his neurologist that he did not have any new problems. (*Id.* at 648.) He related that he was tolerating his intravenous immunoglobulin therapy well and was exercising with bands and using his foot and ankle brace. (*Id.*)

Claimant returned to his neurologist on August 23, 2018, and reported "no new complaints." (*Id.* at 651.) He stated that "[h]e had the last infusion of [intravenous immunoglobulin] at the beginning of this month" and "has been tolerating well." (*Id.*) He rated his pain level at three that day. (*Id.*) Upon physical examination, the neurologist observed that Claimant's muscle tone was normal, he had "no tremor or drift," and his "power [was] near normal in upper and lower ext[remities]." (*Id.* at 652.) His sensation was "distally decreased," he had "trace reflexes in patella bilaterally," and he walked with a "slight steppage gait." (*Id.*)

On September 17, 2018, Claimant presented to his primary care physician and complained of neck pain that radiated to his left shoulder and arm. (*Id.* at 618.) Imaging performed on September 28, 2018, revealed bulging discs and foraminal stenosis in his cervical spine. (*Id.* at 619–21.) Claimant's primary care physician referred him to an orthopedic surgeon for evaluation. (*Id.* at 618.) He presented to the orthopedic surgeon on October 17, 2018, and reported "moderate" neck and left arm pain that he had been treating with medication. (*Id.* at 627.) Upon physical examination, the orthopedic surgeon observed that Claimant had limited range of motion with pain and tenderness in his cervical and lumbar spine, and he walked with an antalgic gait with a limp on the right but did not use an assistive device. (*Id.* at 627–30.) The orthopedic surgeon

recommended surgical intervention "as a last resort for the cervical spine" and urged Claimant "to focus on conservative treatments first." (*Id*. at 631–32.) He prescribed a neck collar and a cervical traction device for Claimant and ordered additional imaging and physical therapy. (*Id*. at 632.)

The imaging was performed on November 12, 2018, and it revealed "Mild degenerative arthritic change of the lumbar spine" and "mild bilateral foraminal encroachment greater on the right than left side at L4-5" and "Degenerative disc disease of the dorsal spine with disc herniations at T5-6, T6-7, and T11-12." (*Id*. at 683–86.) Claimant returned to the orthopedic surgeon for a follow-up appointment on November 28, 2018, and reported that he was "not making a lot of progress" in physical therapy and that it worsened his pain. (*Id*. at 746.) He also related that his pain was aggravated by "Standing, sitting, walking and turning" and relieved by "Lying down on his back." (*Id*.) He stated that his pain was "minimal to moderate." (*Id*.) Upon physical examination, the orthopedic surgeon observed limited range of motion with pain and tenderness to palpation in Claimant's lumbar spine, but he walked with a normal gait and did not use an assistive device. (*Id*. at 746–47.) He recommended that Claimant continue conservative treatments on his spine and referred him to a pain management clinic for spinal injections. (*Id*. at 749.)

Claimant returned to his neurologist on January 9, 2019, and reported that "his balance has been worsening," and he still experienced leg weakness. (*Id*. at 653.) He rated his pain level a three that day. (*Id*.) Upon physical examination, the neurologist observed "trace weakness in lower ext[remities]," as well as "distally decreased" sensation and "trace reflexes in patella bilaterally." (*Id*. at 654.) Claimant also walked with a "slight

steppage gait on right." (*Id.*)  His neurologist recommended that he continue his current treatments and participate in "Home Physical therapy for balance training." (*Id.*)

On January 16, 2019, Claimant presented to his orthopedic surgeon and reported that he "is having severe pain in his neck and left arm . . . with some weakness" and "is still not making much progress." (*Id.* at 750.)  He stated that using his cervical traction device "seems to make his pain worse." (*Id.*)  Upon physical examination, the orthopedic surgeon observed limited range of motion with pain and tenderness to palpation in Claimant's cervical spine, as well as decreased sensation in his left C7 vertebra. (*Id.* at 750–51.)  He explained to Claimant that he could pursue injections or surgical intervention, and Claimant expressed a desire to have surgery. (*Id.* at 752.)  He underwent the surgical procedure on February 5, 2019. (*Id.* at 691–94.)  When he returned to his primary care physician on February 11, 2019, he reported that his oxygen levels were decreasing at night since his surgery, but he was not having trouble breathing. (*Id.* at 674.)  He also stated that while he was in the hospital, he had been taken off his blood pressure medication. (*Id.*)  At his next intravenous immunoglobulin therapy appointment on February 14, 2019, Claimant reported that "he has had a lower oxygen saturation reading ever since he had cervical surgery." (*Id.* at 726.)  On February 20, 2019, Claimant presented to his orthopedic surgeon and reported that "he is doing pretty well overall" and "is getting around without much difficulty." (*Id.* at 754.)  He had limited range of motion with pain and tenderness in his cervical spine upon physical examination. (*Id.* at 754–55.)  The orthopedic surgeon recommended that Claimant "do a lot of walking and be careful about bending, twisting and lifting." (*Id.* at 755.)  He also showed Claimant how to perform neck stretches. (*Id.*)

Claimant presented to a pain management specialist on April 11, 2019, and reported that his neck pain had worsened since his surgery. (*Id.* at 771.) He stated that medication helped his pain and rated it "4/10" at its worst. (*Id.*) Upon physical examination, Claimant's cervical spine was tender to palpation, but he had normal range of motion "in all planes of motion tested although pain noted with left rotation starting at 60 degrees" and full muscle strength in his upper extremities. (*Id.* at 772.) The pain management specialist observed facet loading on the left "with referred pain to the scapula." (*Id.*) He recommended two pain injections, which were performed on May 8, 2019. (*Id.* at 772–74.) Claimant presented to his neurologist on the same day he underwent the injections and stated that "His strength has been about the same as before." (*Id.* at 777.) He "denies any problems" with his intravenous immunoglobulin therapy. (*Id.*) Upon physical examination, he had decreased sensation in his lower extremities but walked with a normal gait. (*Id.* at 778.)

2. *Consultative Medical Examination: Dr. Kip R. Beard, M.D.*

On July 27, 2017, internal medicine specialist Dr. Kip R. Beard, M.D. performed a consultative physical examination of Claimant. (*Id.* at 493–505.) He noted that Claimant's chief complaints were "spinal pain and chronic inflammatory demyelinating polyneuropathy." (*Id.* at 493.) He wrote that Claimant told him he had suffered from worsening lower back pain since 2007 and had been treated with medication, physical therapy, and "spinal manipulation," but he continued to have "constant pain described as aching or cramping" that "is graded between 2 and 7 out of 10" and radiated to both of his legs. (*Id.*) The consultative examiner also wrote that Claimant reported paresthesias in his extremities and leg weakness and stated that his symptoms were aggravated by "prolonged sitting or standing" and alleviated by "lying down and taking medication."

(*Id.*)  Regarding Claimant's chronic inflammatory demyelinating polyneuropathy, the consultative examiner wrote that Claimant told him he received the diagnosis in May 2016 and was treated with "daily oral steroids in addition to [intravenous immunoglobulin] treatments once monthly," and he experienced "ongoing weakness as well as paresthesias in the legs and feet, predominantly from the knees down," and in the fingers.  (*Id.*)  The consultative examiner further wrote that Claimant reported "that he can walk for a few minutes and then will have to stop and rest" and "has issues with balance due to sensation loss the [sic] lower extremities and has more difficulty negotiating uneven or hazardous terrain" and "difficulty climbing."  (*Id.*)

Upon physical examination, the consultative examiner observed that Claimant did not use an ambulatory aid, was stable at station, and had a stable gait that was "mildly slow in pace with intermittent mild dragging of the right foot."  (*Id.* at 496.)  He observed that Claimant was able to get up from a chair "without obvious difficulty," had "mild difficulty" stepping "up and down from the examination table," and "had difficulty with heel walking, toe walking, tandem walking or standing on either leg alone" and "appears unable to fully squat."  (*Id.*)  Claimant had no edema, clubbing, cyanosis, bruits, pain, tenderness, warmth, swelling, or atrophy in his upper or lower extremities, and he had full muscle strength and normal range of motion.  (*Id.* at 498–504.)  His sensation was decreased to light touch and temperature "in a stocking distribution from the knees to the feet" and decreased to vibration "about the knees" but "[a]bsent in the toes."  (*Id.* at 503.)  When examining Claimant's cervical spine, the consultative examiner noted normal curvature, no pain on range of motion testing, no paraspinous muscle tenderness, and no paraspinous muscle spasm, but he observed pain on range of motion testing and paraspinal muscle tenderness in Claimant's thoracolumbar spine.  (*Id.* at 498–99.)

Claimant had reduced range of motion on flexion and extension of the cervical spine and on flexion of the lumbar spine. (*Id.* at 501–02.) When examining Claimant's hands, the consultative examiner observed that he could make a fist bilaterally, extend his fingers bilaterally, oppose his thumbs bilaterally, write with his dominant hand, pick up coins with either hand, tie a string using both hands, and button a button using both hands. (*Id.* at 500.)

The consultative examiner diagnosed Claimant with chronic inflammatory demyelinating polyneuropathy, low back pain, bilateral sciatica, and "intervertebral disc displacement, lumbar spine, according to history." (*Id.* at 505.) He opined that Claimant's "ability to perform physical work-related activities appears impaired for activities such as prolonged standing, walking, negotiating uneven or hazardous terrain, working in hazardous conditions such as heights, operating foot pedals, lifting and carrying." (*Id.*)

### C. Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v.*

*Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the

fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as

a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant satisfied the insured status requirements and was insured through the date of the decision. (Tr. at 23.) She further determined that Claimant had not engaged in substantial gainful activity since the alleged onset of his disability. (*Id.*) She found that Claimant's peripheral neuropathy, chronic inflammatory demyelinating polyneuropathy,

13

degenerative disc disease of the lumbar and cervical spine with stenosis and radiculopathy, status-post discectomy and fusion, history of right foot drop, bilateral sciatica, arthritis, obesity, depression, bipolar disorder, and anxiety constituted "severe" impairments. (*Id.* at 24.) However, she found that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 24–27.) Upon assessing Claimant's RFC, the ALJ determined that he is able "to perform sedentary work . . . except he can stand/walk for two hours in an eight-hour day, sit for six hours in an eight-hour day, lift and carry 20 pounds occasionally and 10 pounds frequently, and can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but never climb ladders, ropes, or scaffolds." (*Id.* at 27.) She found that "[h]e should avoid all exposure to extreme cold, extreme heat, vibration, and workplace hazards, such as moving machinery and unprotected heights." (*Id.*) She also found that he can "frequently finger[], handl[e], and feel[] with the bilateral upper extremities." (*Id.*) In addition, she determined that Claimant can perform "simple, routine, and repetitive tasks that are not at an assembly line or production rate pace" and can "mak[e] simple work-related decisions." (*Id.*)

The ALJ concluded that given the limitations imposed by the Claimant's RFC, he was unable to perform his past relevant work. (*Id.* at 32.) She noted that Claimant is "a younger individual" with "at least a high school education" and that "[t]ransferability of job skills [was] not material to the determination of disability." (*Id.* at 32.) Because the ALJ determined that Claimant was unable to perform the full range of sedentary work, she enlisted a vocational expert to aid in her finding that Claimant is capable of working as a grader/sorter, optical assembler, or toy assembler. (*Id.* at 33–34.) As a result, the

ALJ concluded that Claimant was not "under a disability . . . from March 18, 2017, through the date of this decision." (*Id.* at 33.)

## II.    *LEGAL STANDARD*

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

## III.    *ANALYSIS*

Claimant argues that the ALJ improperly failed to include a sit-stand option and restrictions related to his use of a cane to walk in her RFC assessment. (ECF No. 16 at 2–6.) He asks this Court to reverse the Commissioner's decision and award him benefits or to reverse the Commissioner's decision and remand this matter to the ALJ. (*Id.* at 6.) The

Commissioner responds that substantial evidence supports the ALJ's finding that Claimant could sit for up to six hours in an eight-hour workday and that he did not adequately establish that he needed to use a cane for balance.  (ECF No. 17 at 10–13.)

"In the RFC assessment, the ALJ uses all relevant evidence, medical or otherwise, to determine a claimant's 'ability to meet the physical, mental, sensory, and other requirements of work.'"  *Ladda v. Berryhill*, 749 F. App'x 166, 172 (4th Cir. 2018) (quoting 20 C.F.R. §§ 404.1545, 416.945).  The ALJ's decision "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015).  "Thus, a proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion."  *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019).  Stated another way, "the ALJ must both identify evidence that supports his conclusion and 'build an accurate and logical bridge from [that] evidence to his conclusion.'"  *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (emphasis deleted) (quoting *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016)).

*A. Sit-Stand Option*

Claimant's argument that the ALJ's RFC assessment should have included a sit-stand option principally derives from his various subjective complaints throughout the record in this case that sitting aggravated or failed to relieve his pain.  (ECF No. 16 at 2–3.)  As part of the RFC assessment, the ALJ must evaluate a claimant's "statements and symptoms regarding the limitations caused by her impairments."  *Linares v. Colvin*, No. 5:14-cv-00120, 2015 WL 4389533, at *5 (W.D.N.C. July 17, 2015) (citing 20 C.F.R. §§ 404.1529, 416.929; *Craig v. Chater*, 76 F.3d 585, 593–96 (4th Cir. 1996)).  To evaluate the disabling effect of an individual's symptoms, including pain, the ALJ first determines

whether "objective medical evidence" supports the existence of "a condition reasonably likely to cause the [symptoms] claimed." *Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006); *see* 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).  If so, the ALJ then "evaluate[s] the intensity and persistence of [the claimant's] symptoms" to "determine how [those] symptoms limit [the claimant's] capacity for work."  20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).  An individual's subjective complaints about his symptoms are relevant to the latter determination.  *See id.* §§ 404.1529(c)(3), 416.929(c)(3).  Put simply, the claimant's symptoms "must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the [symptoms], in the amount and degree, alleged by the claimant." *Johnson v. Barnhart*, 434 F.3d 650, 657 (4th Cir. 2005) (per curiam) (quoting *Craig*, 76 F.3d at 591).  The ALJ is obligated to "assess whether the claimant's subjective symptom statements are consistent with the record as a whole." *Vass v. Berryhill*, No. 7:17-cv-87, 2018 WL 4737236, at *6 n.4 (W.D. Va. June 12, 2018), *adopted by* 2018 WL 4704058 (W.D. Va. Sept. 30, 2018).

In this case, the ALJ began her RFC assessment by summarizing Claimant's hearing testimony, noting in particular that he testified about his "issues with his back and neck that causes [sic] issues with standing and sitting." (Tr. at 28.)  Although she found that his "medically determinable impairments could reasonably be expected to cause [his] alleged symptoms," she determined that his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (*Id.*)  To that end, she summarized the evidence of record related to Claimant's treatment for his back and neck conditions and concluded that a limitation "to

less than the full range of sedentary work" adequately accounted for his degenerative disc disease, bilateral sciatica, and arthritis. (*Id.* at 29–30.) Specifically, with regard to his degenerative disc disease and bilateral sciatica, the ALJ pointed to objective examination findings showing normal gait, negative straight leg raising tests bilaterally, and intact sensation as well as his largely conservative treatment of physical therapy, a cervical traction device, and a therapeutic collar. (*Id.* at 29.) She remarked that he had neck surgery in February 2019, but "the fusion remains stable" and his continuing pain was being treated with epidural injections. (*Id.* at 29–30.) And with regard to Claimant's arthritis, the ALJ again pointed to that same conservative treatment in addition to objective examination findings showing normal motor strength in the bilateral upper and lower extremities, normal gait, normal sensation, and normal range of motion in the cervical spine. (*Id.* at 30.)

Put simply, the ALJ explained her reasons for concluding that Claimant's back and neck conditions were not as disabling as he claimed. "If the ALJ points to substantial evidence in support of his decision and adequately explains the reasons for his finding on the claimant's credibility, the court must uphold the ALJ's determination." *Brown v. Astrue*, No. 8:11-cv-03151-RBH-JDA, 2013 WL 625599, at *17 (D.S.C. Jan. 31, 2013), *adopted by* 2013 WL 625581 (D.S.C. Feb. 20, 2013). As such, the undersigned **FINDS** that the ALJ's analysis of Claimant's subjective complaints about the disabling effects of his back and neck conditions is supported by substantial evidence.

Claimant also suggests that the ALJ erred by failing to adopt the sit-stand option included in the RFC assessment by the ALJ on his prior claim for benefits. (ECF No. 16 at 3–4.) When adjudicating a more recent claim for benefits, the ALJ must consider the evidentiary value of any administrative findings on a prior claim by determining whether

there has been a change with the passage of time and whether new evidence merits a different result. *See Cuffee v. Berryhill*, 680 F. App'x 156, 159 (4th Cir. 2017). Claimant acknowledges that the ALJ did so here, but he contends that "she failed to recognize [his] need to alternate between sitting and standing." (ECF No. 16 at 4.) The ALJ explained that "the current evidence of record no longer supports the prior [RFC]," which limited Claimant to light work with some restrictions, including a sit-stand option. (Tr. at 31.) Instead, she determined that his neck surgery warranted further "limitation to sedentary work." (*Id.*) In other words, her RFC assessment is more favorable to Claimant than that on his prior claim. She credited the consultative medical examiner's opinions that Claimant would have difficulty standing for prolonged periods, walking, "negotiating uneven or hazardous conditions such as heights," operating foot pedals, lifting, and carrying and included corresponding limitations in the RFC. (*Id.* at 31–32.) As the Commissioner points out, the record in this case contains no evidence that any medical source ever opined that Claimant was more limited in his ability to sit than the ALJ found him to be. (ECF No. 17 at 11–12.) The undersigned **FINDS** that the ALJ's conclusion that Claimant could sit for six hours per day without a sit-stand option is supported by substantial evidence.

### B. Use of Cane

Claimant also references his subjective complaints about his difficulty balancing as support for his argument that the ALJ's RFC assessment should have accounted for his use of a cane. (ECF No. 16 at 4–5.) The ALJ specifically addressed the cane in her written decision, noting that Claimant "was prescribed a cane to help with balance" but did not use it for gait training physical therapy or at various other medical appointments, nor did he bring it with him to the hearing. (Tr. at 29.) Claimant argues that the ALJ erred by

relying on the physical therapy treatment notes because he received his cane after his sessions (ECF No. 16 at 6), but he is mistaken—the record reflects that Claimant's cane was delivered on August 21, 2017, about a week before his first physical therapy session (Tr. at 538, 547). Claimant's assertions that the other instances the ALJ cited when he was not using a cane are not probative of his need for the cane are likewise unavailing. It was reasonable for the ALJ to conclude that Claimant did not require restrictions providing for his use of a cane for balance when, despite his own subjective complaints that he needed it, the ALJ found that "the record notes on a number of occasions that [he] was using no assistive devices." (Tr. at 29.) As such, the undersigned **FINDS** that the ALJ's decision not to include restrictions related to his use of a cane in her RFC assessment is supported by substantial evidence.

*IV.    CONCLUSION*

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 16), **GRANT** the Commissioner's request to affirm his decision (ECF No. 17), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Frank W. Volk, United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension

of this time period may be granted for good cause shown.  Copies of any objections shall be served on opposing parties and provided to Judge Volk.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals.  28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER: June 8, 2021

Dwane L. Tinsley
United States Magistrate Judge